## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Dr. Frances Roberts-Gregory,
[Address to be filed under seal]

                             Plaintiff,

         v.

American Association for the Advancement of
Science,
1200 New York Avenue, NW, Washington, DC
20005

and

Marco Rubio,
2201 C St. NW
Washington, DC 20520

and

The United States,

                           Defendants.

Case No. _____

## COMPLAINT

1.      Plaintiff Dr. Roberts-Gregory is a highly accomplished academic and researcher.

2.      Beginning on November 1, 2023, she applied for and was ultimately accepted for a Fellowship program run by Defendant American Association for the Advancement of Science (AAAS). Through the Fellowship program, she ultimately accepted an offer of employment with the U.S. Department of State.

3.      AAAS and the Department of State implemented a discriminatory salary policy for participants in the Fellowship program in which employees' salary could be set exclusively by an applicants' prior salary history, which numerous studies have concluded perpetuates the gender and racial pay gap.

4.       Dr. Roberts-Gregory raised complaints about the salary policy, and the decision to set her salary at the lowest salary level under the policy. She specifically noted that the salary decision was discriminatory against her on the basis of her race and gender.

5.      Quickly after Dr. Roberts-Gregory raised the complaints, AAAS terminated Dr. Roberts-Gregory's participation in the Fellowship program, and the Department of State rescinded its offer of employment, all in retaliation for Dr. Roberts-Gregory making complaints about her salary level.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction regarding Dr. Roberts-Gregory's claims against Defendants Marco Rubio and the United States under 28 U.S.C. § 1331. This Court has subject matter jurisdiction regarding Dr. Roberts-Gregory's claims against Defendant AAAS under 28 U.S.C. §§ 1331, 1332, and 1367.

7.      Venue is proper under 42 U.S.C. § 2000e-5(f)(3) and 42 U.S.C. § 2000e-16(d), because a substantial part of the unlawful employment practices herein alleged were committed within the District of Columbia and because the Defendants have their principal offices in the District of Columbia.

## PARTIES

8.      Plaintiff Dr. Frances Roberts-Gregory's is a citizen of the State of Maryland.

9.     Defendant American Association for the Advancement of Science is a corporation located in and doing business in Washington, DC. AAAS has its principal place of business in the District of Columbia.

10.     AAAS accepts millions of dollars in funding from the federal government each year.

11.     Defendant Marco Rubio is the U.S. Secretary of State and is a named Defendant in his official capacity.

12.     Defendant and its involved agency, the State Department, are a "public agency" and "employer" within the meaning of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 203(d) and § 203(x).

## FACTUAL ALLEGATIONS

13.     Dr. Roberts-Gregory is an accomplished political ecologist, environmental scientist, community geographer, and applied anthropologist. She has taught multiple university level courses on environmental science & studies, communications, sustainability, civic engagement, climate justice, and UN climate negotiations. She has published numerous academic papers, including about biases against Black women in STEM.

14.     Dr. Frances Roberts-Gregory is a Black woman.

15.     Dr. Roberts-Gregory holds a BA in Environmental Studies, Sociology, & Anthropology from Spelman College. She also holds a PhD in Environmental Science, Policy, & Management from the University of California, Berkeley.

16.     Dr. Roberts-Gregory has over fifteen years of work experience in her field, including previous employment with the federal government as a policy analyst for mountaintop mining reclamation and enforcement.

17.    Between January 2023 and January 2025, Dr. Roberts-Gregory served as an Environmental Fellow at the Harvard University Center for the Environment.

18.    In 2023–2024, Dr. Roberts-Gregory applied for an AAAS Science & Technology Policy Fellowship (STPF or Fellowship), which provides participating Fellows with a job placement with a federal government agency or office.

19.    Dr. Roberts-Gregory is a dues paying member of AAAS.

20.    In order to apply for an STPF fellowship, Dr. Roberts-Gregory was required to be a dues-paying member of AAAS.

21.    Prospective Fellows apply to the STPF through AAAS. If AAAS accepts the candidate as a Fellow, the Fellows then interview with government agencies for employment placement.

22.    The Fellowship application process is administered by AAAS, which operates the application and interview process through an online portal that it manages.

23.    To be accepted as an STPF Fellow, applicants undergo a highly competitive evaluation process, which involves a three-tier merit review and selection process administered by AAAS.

24.    An applicant can receive up to 100 points based on an evaluation system developed by AAAS that considers the following five categories:

    a.    Scientific/Technical Background & Professional Accomplishment (1-40 points).

    b.    Leadership & Potential (1-15 points).

    c.    Analytical & Problem-Solving Abilities (1-15 points).

    d.    Communication, Interpersonal & Outreach Skills (1-15 points).

    e.    Commitment to STPF Fellowship Mission & Opportunities (1-15 points).

25.     Top candidates in each fellowship area are ranked to determine semi-finalists. Semi-finalists are then interviewed to determine the finalists. Semi-finalists must present briefing memos on designated science policy topics as part of the interview process.

26.      Only the finalists can advance to placement interviews with host offices.

27.     AAAS's selection process is very rigorous and lasts several months. Applications open June 1 each year, with final fellowship offers extended only the following May at the earliest.

28.     Fellowship positions in Executive Branch agencies for AAAS Fellows extend for an initial period of two years, with a renewal by consent of the employee, agency, and AAAS between the first and second year.

29.     The renewal is largely perfunctory. Agencies renew the appointment of nearly every Fellow, unless the Fellow chooses to depart.

30.     In addition, most Fellows are offered the option to continue as permanent federal government employees following the fellowship.

31.     If placed with a government agency under the Fellowship, AAAS Fellows serve as full-time U.S. government employees for the duration of the fellowship.

32.     The Department of State is one of the Executive Branch agencies that participates in the STPF. It maintains an agreement with AAAS regarding employment of STPF Fellows which sets the terms Fellows participation in the Fellowship during their government employment.

33.     During their two-year fellowship terms, AAAS Fellows at the State Department are term federal government employees, whose salaries and benefits are paid by the federal government, and who work full-time for the federal government. However, Fellows must

participate in the Fellowship program to maintain their appointment to their State Department position.

34.     In addition to job placement, AAAS provides Fellows in the program with ongoing resources and support, including mentorship, professional development, and networking opportunities. According to AAAS, "The wide-ranging STPF Professional Development program is designed to help fellows hone skills in policy, leadership, communications, and career strategies, through a workshops, seminars, special interest affinity group programming, and a year-end summit."

35.     AAAS's relationship with Fellows extends after the fellowship ends. AAAS maintains an alumni network for former Fellows. According to AAAS, "The AAAS S&T Policy Fellow network is a powerful force in every realm: government, industry, academia, and the nonprofit sector. Current fellows convene regularly for Professional Development workshops, manage Affinity Groups, and network and share resources. Alumni participate in a number of activities including symposia, networking, and Affinity Groups. All fellows use FellowsCentral, a password-protected online community, to connect and collaborate with each other, publish the Sci on the Fly blog and podcast, and more."

36.     Serving as an AAAS STPF Fellow provides significant career opportunities for participants. As AAAS puts it, "This fellowship is a transformative career opportunity. Fellows are a respected and coveted cadre in the federal policy arena." AAAS adds "As a coveted asset in the federal government, fellows gain hands-on policy experience in a challenging environment. Current and alumni fellows form a highly respected and widely recognized network of policy-savvy scientists and engineers."

37.     Prior to beginning at their Fellowship placement, AAAS requires all Fellows to attend a mandatory two-week orientation program put on by AAAS.

38.     During the period of the Fellowship, Fellows are supervised on a day-to-day basis by employees at the government agency to which they are assigned.

39.     AAAS and the Department of State jointly control Fellow's terms and conditions of employment. Both have control over whether an applicant is initially hired into the Fellowship program, and whether they are hired to a particular government office.

40.     Both AAAS and the Department of State also jointly control firing of Fellows. If AAAS removes a Fellow from the Fellowship program, they are ineligible to remain in their government role and will therefore be terminated from their position in the government agency. AAAS can also request that the government agency terminate a Fellow. On the other hand, the government agency can separately, of its own accord, fire an employee working for the agency under the Fellowship without AAAS's approval.

41.     Both AAAS and the Department of State also jointly control the pay and benefits of Fellows.

42.     STPF Fellows receive a stipend for the duration of the fellowship.

43.     AAAS is responsible for determining the stipend level for Fellows pursuant to AAAS's policies. As the AAAS Stipend Policy states, "Final determination of the stipend level will be made by AAAS."

44.     Fellows are then paid by the Executive Branch agency that employs them. The salary rate is set by the government's GS scale. However, the placement on the GS scale is determined by AAAS based on agreements jointly development between the agencies and AAAS.

45.    The agency also provides the Fellows with employment benefits, such as access to employer sponsored insurance coverage.

46.    As outlined in AAAS's 2024-2025 Stipend Policy distributed to applicants, there are three levels of stipend offered to Fellows.

47.    The level is determined based on only two criteria: length of work experience or past salary. Each stipend level corresponds to a certain level of experience, but if an applicant's prior salary exceeds the stipend level for that level of experience, the applicant will receive the stipend level closest to their prior salary.

48.    The Stipend Policy results in some Fellows receiving higher salaries than others with the same or more level of experience and performing the same work based on nothing more than their prior salary.

49.    For 2024-2025, the stipend levels were as follows:

| Stipend Level | Qualifications | First Year Stipend Salary |
|---|---|---|
| Level I | 0-7 years of post-doctoral full-time employment | $99,200 |
| Level II | More than seven years of post-doctoral full-time employment *or* a prior salary level at or exceeding the Level II stipend | $112,425 |
| Level III | More than fifteen years of post-doctoral full-time employment *or* a prior salary level at or exceeding the Level III stipend | $128,956 |

50.    The Stipend Policy makes an exception for Fellows who work as engineers. Engineers need not possess a doctorate, but instead may qualify for a Level II or III stipend with a master's degree and the requisite years of professional engineering experience.

51.    The Stipend Policy carves out an exception solely for engineers, a traditionally male-dominated field, but makes no similar exceptions for fields disproportionately occupied by women or people of color.

8

52.     In addition a stipend, AAAS provides some Fellows with other financial support, including a travel/professional training allowance, medical coverage, and relocation benefits.

53.     Dr. Roberts-Gregory successfully completed this months-long application process to be selected as a Fellowship finalist.

54.     Due to her outstanding credentials and professional achievements, Dr. Roberts-Gregory was highly sought after by government agencies and bureaus participating in the STPF program. She was offered over 20 interviews and follow-up interviews with approximately 15 different government agencies, offices, and bureaus.

55.     Dr. Roberts-Gregory had one of, if not the, highest number of interviews of any STPF finalist in the 2023-2024 placement cycle.

56.     After completing interviews with various government agencies through the STPF program, Dr. Roberts-Gregory was offered more than ten different placements with different agencies, including the Department of Transportation, Department of Energy, Department of Agriculture, Department of Health and Human Services, the National Science Foundation, and the Department of State.

57.     Dr. Roberts-Gregory ultimately accepted an offer with the Department of State, Office of Energy Diplomacy for the Middle East and Asia, Bureau of Energy Resources on May 3, 2024.

58.     To accept the position at the Department of State, she turned down nine other prestigious placements with federal agencies and offices.

59.     Charles Brown was one of Dr. Roberts-Gregory's interviewers from the Office of Energy Diplomacy for the Middle East and Asia, Bureau of Energy Resources, and served as her primary recruiter and contact in that office. Mr. Brown is an employee of the Department of

State. Mr. Brown assured Dr. Roberts-Gregory multiple times that she was the office's top choice for the position.

60.    After a Fellow accepts a position with an agency, AAAS determines the Fellow's stipend level.

61.    In April 2024, Dr. Roberts-Gregory timely provided AAAS with documentation for AAAS to calculate her stipend level. She sought a Level III stipend under AAAS's policy— the highest level of compensation.

62.    AAAS's Senior Grants Director, Cory Bridges, responded to Dr. Roberts-Gregory's submission and incorrectly claimed that Dr. Roberts-Gregory was required to submit additional documentation to justify a Level III stipend.

63.    Dr. Roberts-Gregory followed Ms. Bridges's instructions and sent additional tax documents. Dr. Roberts-Gregory also requested a phone call to discuss the Stipend Policy.

64.    Ms. Bridges responded indicating that AAAS would only approve Dr. Roberts-Gregory for a Level I stipend, the lowest level stipend and the same stipend as would be awarded to a Fellow with zero years of work experience.

65.    On April 26, 2024, Dr. Roberts-Gregory wrote an email to Ms. Bridges outlining issues with the Stipend Policy, stating her belief that she was entitled to a Level III stipend under the policy, and again requesting a phone call to discuss these concerns.

66.    Specifically, Dr. Roberts-Gregory explained that she believed she was entitled to a Level III Stipend based on her prior salary.

67.    She also noted that accepting the Level I stipend would have meant a significant reduction in pay, and was far below what the Level III stipend offered.

68.    Dr. Roberts Gregory also explained that the Stipend Policy has a discriminatory impact on women and people of color. She explained: "As a working professional, Black woman caretaker, and interdisciplinary scientist with 10+ years of relevant work experience in various environmental sectors (and with many of the aforementioned identities), I cannot afford to take a $50-100K pay cut, nor have my 10+ years of work experience erased. I'd love to share more thoughts and work towards a satisfactory solution so that AAAS is not complicit in worsening the racialized and gendered pay gap, contributing to pay inequities, and disadvantaging interdisciplinary scientists from underrepresented backgrounds when we are already underrepresented in AAAS finalist numbers. I am also very happy to share the contact info of past employers and AAAS alums, AAAS ambassadors, and mentors who can confirm my previous salary and 10+ years of relevant work experience. Finally, I am happy to share letters of support and jump on a quick 15-minute call today or early next week to discuss these concerns further."

69.    Ms. Bridges responded that AAAS was not changing its decision to award Dr. Roberts-Gregory a Level I stipend. She further stated that the stipend level under AAAS's policy was calculated by looking at "either years of work experience post-doc or current salary, which is based on the documentation outlined in the policy (pay stubs within the last 6 months or a W2 or 1099 from 2022/2023 documenting the salary requested, not a partial year)."

70.    On May 1, 2024, Dr. Roberts-Gregory sent a follow-up message to Ms. Bridges. She stated she "would like to formally request a phone or zoom conversation with the AAAS DEI staff and staff from your office to ensure my concerns about equity in work experience operationalization and metric formulation are meaningfully addressed as an underrepresented Black woman and applied anthropologist."

71.    She noted that the method AAAS uses to calculate years of experience disadvantages fields disproportionately occupied by and methodologies disproportionately used by Black women.

72.    In addition, the AAAS Stipend Policy carves out an exception solely for engineers, a traditionally male-dominated field, but makes no similar exceptions for fields disproportionately occupied by women or people of color.

73.    Dr. Roberts-Gregory further explained in her email that relying solely on the most recent salary that an applicant earned to award higher stipends to Fellows no matter their years of experience disparately harms women and people of color, and contributes to the "gendered and racialized pay gap."

74.    Because AAAS applied this discriminatory method to Dr. Roberts-Gregory, discounting all of her experience and professional accolades to focus exclusively on her most recent salary, Dr. Roberts-Gregory noted that she did "not feel like you value my scientific knowledge, vast work experience, and methodological diversity as a Black woman," and asked that Ms. Bridges reconsider the "hurtful devaluation of my experience and worth."

75.    AAAS responded, through the Director of the STPF program, Dr. Rashada Alexander, that AAAS would not change Dr. Roberts-Gregory's stipend level.

76.    Dr. Alexander also urged Dr. Roberts-Gregory to consider withdrawing from the Fellowship, stating "I understand that accepting a fellowship in STPF is a choice that may not be aligned with what and how you need to navigate your career at this time. I wish you all the best in making that choice for yourself." This comment was surprising since Dr. Roberts-Gregory had not suggested that she wanted to withdraw from the Fellowship; she had only stated that she wanted to be fairly compensated and not discriminated against.

12

77.    Dr. Roberts-Gregory resent the documents that she previously sent and explained why they should justify a Level III stipend: "I continue to seek fair and equitable compensation that reflects my 10+ years of professional work experience as an applied anthropologist, most recent full-time salary offer of $135K, and my 2023 wages + compensation as disclosed in my W-2s and 1099s ($131,118.07). Since I have provided all requested documentation, and I am happy to provide any additional requested documentation . . . ." She requested a phone call to discuss her complaints about the Stipend Policy.

78.    AAAS initially ignored Dr. Roberts-Gregory's request for a meeting.

79.    AAAS eventually set a meeting for May 9, 2024.

80.    During the May 9, 2024 meeting, Dr. Roberts-Gregory raised concerns that the AAAS Stipend Policy constituted race and sex discrimination.

81.    In response to her complaints of discrimination, Dr. Alexander accused Dr. Roberts-Gregory of turning AAAS and its staff into "adversaries."

82.    Dr. Roberts-Gregory was surprised by this response. She said she did not intend to make anyone at AAAS her adversary, she simply wanted to request fair compensation that she believed she was entitled to.

83.    Dr. Alexander also claimed during the meeting that Dr. Roberts-Gregory had denigrated AAAS staff members. This was false. Dr. Roberts-Gregory's communications with staff members had been professional. While Dr. Roberts-Gregory had questioned AAAS's decision to award her a lower stipend level, she did so in a respectful manner and did not personally attack any staff member.

84.    Dr. Mackenzie threatened during the meeting that it was considering contacting the Department of State to rescind offer of employment.

85.     Dr. Alexander and Dr. Mackenzie also threatened to impose new conditions on Dr. Roberts-Gregory's acceptance of the Fellowship, including requiring Dr. Roberts-Gregory to attend communications training.

86.     Following the meeting, also on May 9, 2024, Dr. Roberts-Gregory sent an email to her points of contact at the Department of State, Mr. Brown and Christine Bishai. Dr. Roberts-Gregory explained to them that she felt the meeting with Dr. Alexander was "uncomfortable and threatening."

87.     Dr. Roberts-Gregory and Mr. Brown spoke over the phone in or around that time, during which Mr. Brown emphasized the importance of Dr. Roberts-Gregory conforming with what AAAS was asking.

88.     Dr. Roberts-Gregory explained that she had made complaints to AAAS about how its fellowship policies devalued "Black women scientists" and had tried to address her concerns with AAAS. However, she explained that AAAS refused to address her concerns, and instead attacked her and attempted to punish and censor her.

89.     Dr. Roberts-Gregory explained that AAAS had threatened to contact the State Department to have her employment offer rescinded. She noted that AAAS staff "did not like being challenged" by someone "advocat[ing] for fair and equitable compensation in alignment with their work experience."

90.     She concluded by making clear that she was still excited by the opportunity: "I am still excited to serve in the State Department and lend my scientific and anthropological expertise to energy diplomacy. Any advice or support in navigating this developing situation would be greatly appreciated so that I can support your office in the coming months."

91.    Also on May 9, Dr. Roberts-Gregory sent an email to AAAS's Chief Executive Officer Sudip Parikah and the Chair of its Board of Directors, Gilda Barabino. Dr. Roberts-Gregory explained to them that she had been told she would receive a Level I stipend rather than Level III. She further explained that she had raised complaints that AAAS's stipend process contributes to the gendered/racialized pay gap. She also detailed the meeting from earlier in the day, and stated that "behavior from AAAS staff, in addition to being inappropriate and unprofessional, amounted to abuse, threats, and bullying of me for daring to raise the question of equity and to challenge the evaluation of my credentials. I am confused as to why I am being targeted with these sanctions and treated so disrespectfully when I have complied with all requests and earned my spot as a finalist. In fact, I participated in over twenty interviews and follow-up interviews for placement offers and received over 10 placement offers before I accepted the offer from the State Department. My professional opportunities should not be rescinded, my voice should not be silenced, and my dignity should not be assaulted for respectfully advocating for fair and equitable compensation and voicing concerns about inherently biased metrics that contribute to the racialized/gendered pay gap."

92.    She went on to state: "this matter should clearly focus on stipend levels and equity in work experience operationalization for interdisciplinary scientists and applied anthropologists" and that "Black women are too often faulted for not sounding and acting like their white women counterpart." She requested that AAAS establish a mediation process to review the matter. She noted "it is important that AAAS does not stand for retaliatory, abusive, bullying, and unprofessional accusations that directly harm Black women in STEM."

93.    She concluded: "I have no doubt that a review of my unique background will demonstrate that I have the professional experience and financial statements to support being

offered a Level 3 stipend. I am furthermore still excited to serve in the State Department and lend my scientific and anthropological expertise to energy diplomacy. Please support me in finding a solution that does not result in retaliation, false accusations, or abuse."

94.    Later on May 9 Dr. Alexander wrote Dr. Roberts-Gregory a follow up message.

95.    Dr. Alexander criticized Dr. Roberts-Gregory's communication style and claimed that "your recent engagement via email with STPF staff missed the mark." However, Dr. Alexander offered no specifics as to what Dr. Roberts-Gregory said that was improper, other than to claim that Dr. Roberts-Gregory was wrong to object to the pay policy and her stipend level.

96.    Dr. Alexander criticized Dr. Roberts-Gregory for complaining that the stipend policy was racially discriminatory, and discriminatory based on sex. She suggested that Dr. Roberts-Gregory was not fit to work in the federal government because she raised such concerns, stating: "You stated that you are comfortable with the federal government's operationalization of work experience and compensation model. At the same time, you characterized STPF's stipend policy, which is aligned with the federal government's compensation practices, as "racist" and 'egregious.'"

97.    Dr. Alexander also falsely claimed that Dr. Roberts-Gregory made personal attacks on AAAS staff members. Dr. Roberts-Gregory made no such personal attacks, or anything that could be reasonably construed as a personal attack.

98.    Dr. Alexander also falsely claimed that Dr. Roberts-Gregory did not follow the stipend policy's submission rules and missed deadlines. This is not true, as Dr. Roberts-Gregory submitted all relevant information timely and complied with the submission guidelines given to her by AAAS.

99.    Dr. Alexander further stated that "the placement offer that you have accepted is contingent upon participation in the STPF." She also claimed that "The prospective host office is currently determining whether and how they would like to proceed with your placement. If they choose not to proceed, you will return to the finalist pool still awaiting matches."

100.    Regarding the stipend level, Dr. Alexander reversed AAAS's prior decision and stated that Dr. Roberts-Gregory was eligible for a Level II stipend of $112,425.

101.    Dr. Alexander also stated in the email that new conditions were being placed on Dr. Roberts-Gregory's acceptance of the Fellowship. Specifically, in order to continue with the Fellowship, Dr. Alexander stated "the following will be additional conditions of your fellowship:

1.    You will send a written apology to the staff member, STPF Senior Grants Director, Cody Bridges, for the unnecessary personal attacks directed towards them by COB of the day you submit your formal fellowship notification.

2.    You will need to complete a suite of LinkedIn Learning courses focused on communicating through disagreement and inclusive communication. We will provide access to these online courses and require that you provide documentation of completion with the submission of your formal fellowship notification.

3.    You will copy the STPF Director and AAAS Chief Programs Officer on all communication with STPF staff going forward, throughout the conclusion of your fellowship.

4.    You will have no direct contact with the STPF Senior Grants Director, going forward throughout the conclusion of your fellowship.

Please let us know if you want to proceed as a finalist in STPF and pursue a placement in the program as described above and at a Level II stipend by noon ET on May 13th. A lack of a response to STPF staff with Julia and I copied by that deadline will be considered as declining to continue in the placement process and fellowship opportunity."

102.    Dr. Roberts-Gregory responded on May 13, 2024. She stated: "In response to your most recent email and upon reflecting on your desire for inclusive communication and

communicating through disagreement, this is a loving, yet formal, request for mediation between me and your staff via HR, an Ombudsmen program, culturally sensitive mediators, and the AAAS Executive Director and Board of Directors."

103.    Dr. Roberts-Gregory further responded to several of the points and questions in Dr. Alexander's email.

104.    Dr. Roberts-Gregory reiterated that she "formally and enthusiastically accept placement with the State Department via the AAAS S&T fellowship program and professional development opportunity. This is an exciting opportunity!"

105.    Regarding the compensation level that AAAS had offered her, Dr. Roberts Gregory explained that she believed she qualified for a Level III stipend. She further stated that she had attempted to work with AAAS staff to submit the information requested to set her stipend level.

106.    She noted that "I never criticized, denigrated, or attacked any staff person personally; I simply expressed hurt and frustration over the perceived devaluation of my experience and methodological diversity through the AAAS work experience evaluation metric and stipend level determination."

107.    She went on to note her displeasure in AAAS's handling of the situation, specifically during the May 9, 2024 meeting.

108.    Dr. Roberts Gregory noted that she felt that during the meeting she was placed in an "extremely uncomfortable position where I did not feel safe to speak candidly." She went on to say that the tone of the meeting was "frightening, intimidating, punitive, and retributory." She further stated "I do not feel that my 1. equity concerns and 2. feedback on how AAAS's metric

18

for operationalizing work experience for interdisciplinary scientists and applied anthropologists contributes to the racialized and gendered (i.e. intersectional) pay gap were taken seriously."

109.    She further encouraged AAAS to address the issues that she raised, stating: "Last week, and throughout my email correspondences, I raised equity concerns about how AAAS' work experience operationalization contributes to the racialized and gendered pay gap. The gendered and racialized pay gap is egregious, and it is my professional and scholarly opinion that compensation policies that contribute to structural and institutional inequity are egregious. Inequality is egregious."

110.    Additionally, she noted: "The AAAS S&T operationalization of work experience, from a scholarly and anthropological analysis, contributes to the racialized and gendered pay gap when it erases years of work experience for BIPOC scientists - the same scientists methodologically underrepresented in STEM and the same scientists who statistically work multiple professional positions and perform a disproportionate share of emotional, intellectual, and care labor in the sciences years before they file their dissertations. This metric is also inherently biased against interdisciplinary and applied anthropologists (and folk at the intersections of multiple of the aforementioned identities) when it privileges and makes unique allowances for engineers with master's degrees and scientists who use methodologies that are less time-consuming than their applied, community-based, and feminist peers."

111.    She further noted that it was unfair for AAAS to place new conditions on her acceptance of the Fellowship after she raised concerns about the stipend. She stated "The potential condition to reenter the interview pool after already accepting an offer, and by default, rejecting at least nine other offers, feels punitive and retaliatory. To participate in an exhausting and draining interview week + week of follow-up interviews, I had to take a week off from busy

work, research, and elder care schedules. Punitive conditions that jeopardize my professional

development opportunities and threaten my federal employment opportunities are ripe for legal

discrimination claims, complaints, and grievances."

112.    Despite disagreeing with the new conditions that AAAS placed on her acceptance

of the Fellowship, Dr. Roberts-Gregory agreed to comply with AAAS's demands.

113.    Specifically, Dr. Roberts-Gregory responded "I have no problem sharing and

clarifying my equity concerns about the work experience operationalization and metric from my

email correspondence with the STPF Senior Grant Director Cody Bridges. I have never and will

never personally attack any staff member, including Cody Bridges. Since I have no personal

attacks to apologize for, I am happy to reaffirm that I do not believe in personal attacks and will

never personally attack any staff person. I am also happy to share such a statement directly with

the AAAS S&T director since you have asked me to not communicate with Cody Bridges

throughout the conclusion of my fellowship."

114.    She also stated "I am always happy to complete additional communications

courses. I would also love to offer to facilitate workshops for you and your staff on inclusive

communications for different disciplines and intersectional identities as a seasoned

communications professional/educator."

115.    Further, she said "I am happy to copy the STPF Director and AAAS Chief

Programs Officer on all communication with STPF staff moving forward and throughout the

conclusion of my fellowship. I will also copy the AAAS Board of Directors and Executive

Director on all communications moving forward for my safety and protection while a mediator is

secured."

116.    She concluded her email by noting "I genuinely look forward to building and deepening a relationship with you and AAAS S&T staff that, as I stated in our meeting last week, is based on allyship, truth, and inclusivity as opposed to one that is adversarial, antagonistic, or punitive. Thank you again for the opportunity to participate in this professional development opportunity. I appreciate your desire to augment my professional communications skills and I look forward to moving forward in the spirit of inclusive communication and communicating through disagreement. I'm also always open to meeting up in person for a cup of tea when I'm in town supporting my mother with elder care. I hope you see me as a member of your professional science policy family because I see you as members of my professional science policy family. Take care and I look forward to hearing back from you soon!"

117.    On May 14, 2024, Mr. Brown contacted Dr. Roberts-Gregory to ask how things were progressing with AAAS. He told her that he was asked by the AAAS team to join a call to discuss her and her Fellowship placement. Mr. Brown reassured Dr. Roberts-Gregory that she was the top choice for his office, that his office really wanted her to come work for them, and that he was confused about why AAAS did not understand "who you are." He also promised to call her back after his meeting with AAAS.

118.    Later on May 14, 2024, Dr. Alexander responded to Dr. Roberts-Gregory's May 13, 2024 email. She stated that "the fellowship offer you previously received will be revoked, and your application will be withdrawn from the STPF process."

119.    Dr. Alexander did not dispute that Dr. Roberts-Gregory had agreed to the new conditions that AAAS placed on Dr. Roberts-Gregory's acceptance of the Fellowship.

120.    Dr. Alexander stated that the Fellowship offer was being revoked because of "the way" Dr. Roberts-Gregory had presented concerns about the stipend level and race and gender discrimination within the Fellowship program.

121.    Dr. Alexander falsely claimed that the way that Dr. Roberts-Gregory presented concerns to AAAS could "impact your ability to build relationships both within and outside of the STPF program" and that her words had the impact of attacking and harming relationships with staff members.

122.    No reasonable view of Dr. Roberts-Gregory's expression of her concerns could conclude that her comments would harm her ability to build relationships, or could be construed as attacking individuals.

123.    Dr. Roberts-Gregory never heard back from Mr. Brown after he met with AAAS and her fellowship was revoked.

124.    After the Fellowship was rescinded, Dr. Irma McClaurin wrote Dr. Sudip Parikh and Dr. Gilda Barabino an email objecting to the rescission of the Fellowship. Dr. McClaurin is an alumnus of the Fellowship program and has served as a reviewer for AAAS. She noted "In all my experience of working with fellowships and being a reviewer, I have never seen such action taken over such a small matter. It is insidious and beneath what this Association should be doing or allowing its staff to do. The punishment is disproportionate to anything Dr. Frances wrote or said. I have to ask myself why is the AAAS trying to destroy the future of a Black woman scientist? Why???"

125.    The withdrawal of the Fellowship, and the discrimination and retaliation that she experience, caused Dr. Roberts-Gregory emotional distress. This included added stress related to

economic insecurity as Dr. Roberts-Gregory was forced to spend time networking and looking for alternative employment after the Fellowship was withdrawn.

126.    Dr. Roberts-Gregory supports her aging mother with elder care. The withdrawal of the Fellowship made this work additionally taxing, as Dr. Roberts-Gregory was forced to take time to network and look for alternative employment after the Fellowship was withdrawn.

127.    The withdrawal of the Fellowship is likely to have long-term consequences for Dr. Roberts-Gregory's career trajectory and future earnings.

## Claims against Defendant AAAS

## COUNT I

### Sex-Based Pay Discrimination in Violation of the Equal Pay Against AAAS, 29 USC §§ 206(d), 215(a)(2)

128.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

129.    Dr. Roberts-Gregory is an employee within the meaning of 29 USC § 203(e).

130.    AAAS is an employer within the meaning of 29 USC § 203(d).

131.    The salary that AAAS offered Dr. Roberts-Gregory was discriminatory on the basis of sex.

132.    The salary that AAAS offered Dr. Roberts-Gregory was unequal to similarly situated male colleagues, despite her Fellowship position requiring equal skill, effort, and responsibility to be performed under similar working conditions.

133.    The Stipend Policy makes salary decisions solely on the prior salary of the Fellow.

134.    AAAS's determination that Dr. Roberts-Gregory was not entitled to the highest stipend level was based solely on a review of her salary history.

23

135.    AAAS's decision to base the stipend level on Dr. Roberts-Gregory's prior salary was not a "factor other than sex" within the meaning of 29 USC § 206(d)(1)(iv) because AAAS used prior salary as a proxy for sex.

136.    AAAS's actions violated 29 USC § 206(d)(1).

137.    Dr. Roberts-Gregory suffered damages as a result of AAAS's unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

## COUNT II

**Retaliation in Violation of the Equal Pay Against AAAS, 29 USC § 215(a)(3)**

138.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

139.    Dr. Roberts-Gregory made multiple complaints to AAAS regarding its discriminatory pay policies, including that AAAS had discriminated against her on the basis of sex by offering her a lower salary on a discriminatory basis.

140.    AAAS discriminated and retaliated against Dr. Roberts-Gregory because she raised discrimination complaints, including by placing punitive conditions on her acceptance of the Fellowship, disparaging her to Department of State employees, and retracting the Fellowship offer.

141.    AAAS's actions violated 29 USC § 215(a)(3).

142.    Dr. Roberts-Gregory suffered damages as a result of AAAS's unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

## COUNT III

**Race And Sex Discrimination in Violation of the D.C. Human Rights Against AAAS, D.C. Code § 2-1402**

143.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

144.    Dr. Roberts-Gregory is an employee within the meaning of D.C. Code § 2-1401.02(9)(A).

145.    AAAS is an employer within the meaning of D.C. Code § 2-1401.02(10).

146.    AAAS is an employment agency within the meaning of D.C. Code § 2-1401.02(10).

147.    AAAS failed or refused to hire, and otherwise discriminated against Dr. Roberts-Gregory with respect to her compensation, terms, conditions, and privileges of employment, wholly or partially for a discriminatory reason based upon her race, color, and sex.

148.    The salary that AAAS offered Dr. Roberts-Gregory was discriminatory on the basis of sex.

149.    The salary that AAAS offered Dr. Roberts-Gregory was unequal to similarly situated male colleagues, despite her Fellowship position requiring equal skill, effort, and responsibility to be performed under similar working conditions.

150.    The Stipend Policy makes salary decisions solely on prior salary of the Fellow.

151.    The Stipend policy has a disparate impact on women and Black applicants because it basis salary on prior wage rates, which disproportionately harms women and people color because it ensures that systemic pay discrimination is a feature of setting salary rates.

152.    The gender and wage pay gap is particularly acute in the STEM fields, where AAAS draws it Fellowship applicants.

153.    AAAS's determination that Dr. Roberts-Gregory was not entitled to the highest stipend level was based solely on a review of her salary history.

154.    AAAS's decision to base the stipend level on Dr. Roberts-Gregory's prior salary was not a factor other than sex because AAAS used prior salary as a proxy for sex.

155.    AAAS withdrew the Fellowship offer made to Dr. Roberts-Gregory for discriminatory reasons on the basis of her race, color, and sex.

156.    AAAS's actions violated D.C. Code §§ 2-1402.11(a)(1)(A) and (a)(2).

157.    Dr. Roberts-Gregory suffered damages as a result of AAAS's unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

### COUNT IV

### Retaliation in Violation of the D.C. Human Rights Against AAAS, D.C. Code § 2-1402

158.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

159.    Dr. Roberts-Gregory made multiple complaints to AAAS regarding its discriminatory pay policies, including that AAAS had discriminated against her on the basis of race and sex by offering her a lower salary on a discriminatory basis.

160.    AAAS discriminated against and retaliated against Dr. Roberts-Gregory because she raised discrimination complaints, including by placing punitive conditions on her acceptance of the Fellowship, disparaging her to Department of State employees, and retracting the Fellowship offer.

161.    AAAS's actions violated D.C. Code § 2-1402.61.

162.    Dr. Roberts-Gregory suffered damages as a result of AAAS's unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

**COUNT V**

**Race Discrimination and Retaliation in Violation of Title VI of the Civil Rights Act of 1964 Against AAAS, 42 U.S.C. § 2000d**

163.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

164.    AAAS and the STPF constitute a program or activity receiving Federal financial assistance within the meaning of 42 U.S.C. § 2000d.

165.    AAAS intentionally discriminated against Dr. Roberts-Gregory because of her race when it denied Dr. Roberts-Gregory the ability to participate in the STPF.

166.    AAAS discriminated against and retaliated against Dr. Roberts-Gregory because she raised discrimination complaints, including by placing punitive conditions on her acceptance of the Fellowship, disparaging her to Department of State employees, and retracting the Fellowship offer.

167.    AAAS's actions violated 42 U.S.C. § 2000d.

168.    Dr. Roberts-Gregory suffered damages as a result of AAAS's unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

## COUNT VI

## Race Discrimination and Retaliation in Violation of the 1866 Civil Rights Act, 42 U.S.C. § 1981

169.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

170.    AAAS intentionally discriminated against Dr. Roberts-Gregory because of her race when it denied Dr. Roberts-Gregory the ability to participate in the STPF.

171.    AAAS discriminated against and retaliated against Dr. Roberts-Gregory because she raised discrimination complaints, including by placing punitive conditions on her acceptance of the Fellowship, disparaging her to Department of State employees, and retracting the Fellowship offer.

172.    Dr. Roberts-Gregory had a contractual relationship with AAAS as a dues paying member of AAAS and through her acceptance of the STPF from AAAS. AAAS prevented Dr. Roberts-Gregory's from the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship in a discriminatory manner on the basis of her race.

173.    Dr. Roberts-Gregory sought a contractual relationship with the Department of State and its vendors, including vendors providing employee benefits. AAAS prevented Dr. Roberts-Gregory's from forming a contract with the Department of State and its vendors, and from the enjoyment of benefits, privileges, terms, and conditions of such a contractual relationship, in a discriminatory manner on the basis of her race.

174.    AAAS's actions violated 42 U.S.C. § 1981.

175.    Dr. Roberts-Gregory suffered damages as a result of AAAS's unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

## COUNT VII

### Tortious Interference Under D.C. Law Against AAAS

176.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

177.    Dr. Roberts-Gregory established a business relationship with the Department of State when she accepted a Fellowship position with the agency.

178.    AAAS knew of Dr. Roberts-Gregory's relationship with the Department of State.

179.    AAAS intentionally interfered with Dr. Roberts-Gregory's relationship with the Department of State by encouraging the Department of State to withdraw any offer of employment from Dr. Roberts-Gregory.

180.    AAAS was certain or substantially certain that its actions would cause interference with Dr. Roberts-Gregory's business relationship.

181.    Dr. Roberts-Gregory suffered damages as a result of AAAS's unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

### Claims against Defendants Rubio and the United States

### COUNT VIII

### Retaliation in Violation of the Equal Pay Act Against Defendant Rubio and the United States, 29 U.S.C. § 215(a)(3)

182.    Plaintiff realleges and incorporates the allegations in each of the preceding paragraphs.

183.    Dr. Roberts-Gregory made complaints to Department of State employees regarding the discriminatory pay rate that she was offered and the discriminatory nature of the stipend process.

184.    Defendants discriminated and retaliated against Dr. Roberts-Gregory because she raised discrimination complaints by retracting her offer of employment.

185.    Defendants' actions violated 29 U.S.C. § 215(a)(3).

186.    Dr. Roberts-Gregory suffered damages as a result of Defendants' unlawful conduct, including lost compensation and other benefits of employment, emotional distress, reputational harm, and other nonpecuniary losses.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

1. Declare that Defendants have violated the forgoing statutes;

2. Order Dr. Roberts-Gregory's reinstatement or in the alternative front pay to compensate her for the loss of employment;

3. Award make-whole relief for the retraction of her employment offer, including back-pay for salary and benefits;

4. Award liquidated damages as provided for under law;

5. Award compensatory damages, including damages for emotional distress, reputational harm, and search for work expenses;

6. Award interest and tax-gross up on the forgoing monetary remedies;

7. Award punitive damages;

8. Award reasonable attorney fees, costs, and expenses; and

9. Award other relief that the Court deems just and proper.

### JURY DEMAND

Plaintiff demands trial by jury on all issues.

Respectfully submitted,

/s/ Michael Ellement
Michael Ellement
Charlotte H. Schwartz
James & Hoffman, P.C.
1629 K Street NW, Suite 1050
Washington, DC 20006
Tel: (202) 496-0500
Fax: (202) 496-0555
mpellement@jamhoff.com
chschwartz@jamhoff.com

Dated: May 12, 2025                          *Attorneys for Plaintiff*