**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| FRANCES ROBERTS-GREGORY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:    25-1436 (RC) |
| | : | |
| v. | : | Re Document Nos.:   19, 21 |
| | : | |
| AMERICAN ASSOCIATION FOR THE | : | |
| ADVANCEMENT OF SCIENCE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART FEDERAL DEFENDANTS' MOTION TO DISMISS**

**I.  INTRODUCTION**

Plaintiff Frances Roberts-Gregory alleges that Defendants Marco Rubio and the United

States (collectively, the "Federal Defendants") as well as Defendant American Association for

the Advancement of Science (the "Association" or "AAAS") unlawfully discriminated and

retaliated against her.  She alleges that in offering her a lower stipend than others for the

Association's fellowship program, the Association and the Federal Defendants treated her

differently based on her race and sex and that their stipend policy created an unlawful disparate

impact among underrepresented groups.  She also alleges that they unlawfully retaliated against

her by revoking her fellowship offer after she complained about the alleged discrimination.

The Federal Defendants, but not the Association, move to dismiss all claims against

them.  The Court concludes that Dr. Roberts-Gregory fails to state a claim of disparate-treatment

discrimination but otherwise denies the Federal Defendants' motion to dismiss.[1]

---

[1] After the Federal Defendants filed their motion to dismiss, the Association requested a
stay of discovery pending this Court's decision on the motion to dismiss.  *See* Mot. to Stay, ECF

## II. FACTUAL BACKGROUND

Dr. Roberts-Gregory alleges in her First Amended Complaint ("Complaint"), ECF No. 14, as follows. Dr. Roberts-Gregory "is a Black woman" with "a Ph.D. in Environmental Science, Policy, & Management." Compl. ¶¶ 14–15. In the fall of 2023, she applied for a Science & Technology Policy Fellowship ("Fellowship" or "STPF") position with the Association. *Id.* ¶¶ 18, 58. The Fellowship program vets applicants through "a three-tier merit review and selection process administered by AAAS." *Id.* ¶ 23. The Fellowship "provides [selected applicants] with a job placement with a federal government agency or office." *Id.* ¶ 18. Once an applicant is accepted into the Fellowship, they may then "interview with government agencies for employment placement." *Id.* ¶ 21. "[A]ll fellowship placement offers are made by AAAS STPF on behalf of prospective host offices," and the Association, not the government agency, "sends formal fellowship offers and terms to fellows at the end of the process." *Id.* ¶¶ 29–30.

If an applicant receives a Fellowship position with a federal executive agency, the position "extend[s] for an initial period of two years." *Id.* ¶ 32. But agencies may renew fellows for longer terms, and they do so for "nearly every [f]ellow." *Id.* ¶ 33. In fact, "most [f]ellows are offered the option to continue as permanent federal government employees following the fellowship." *Id.* ¶ 34.

During a fellow's employment with an agency, the Association and the agency "jointly control" the fellow's "terms and conditions of employment." *Id.* ¶ 43. They also "jointly control the firing of [f]ellows." *Id.* ¶ 44. The Association can "remove[ ] a [f]ellow from the Fellowship

---

No. 21. Because the Court now resolves the pending motion to dismiss, it denies the motion to stay as moot.

program," making them "ineligible to remain in their government role" and resulting in termination "from their position in the government agency." *Id.* The Association "can also request that the government agency terminate a [f]ellow." *Id.* Or "the government agency can separately, and of its own accord, fire an employee working for the agency under the Fellowship without AAAS's approval." *Id.*

Dr. Roberts-Gregory successfully applied to the Fellowship program, and she eventually received and "accepted an offer with the Department of State." *Id.* ¶ 69. Once a fellow "accepts a position with an agency, AAAS determines [their] stipend level." *Id.* ¶ 72. The Association's stipend policy for 2024–2025 had three levels. *Id.* ¶ 53. An applicant with between zero and seven years of post-doctoral, full-time employment received a Level I stipend of $99,200 in their first year. *Id.* An applicant between seven and fifteen years of post-doctoral, full-time employment received a Level II stipend, worth $112,425. *Id.* Finally, an applicant with over fifteen years of post-doctoral, full-time employment received a Level III stipend of $128,956. *Id.*

This stipend policy came with two exceptions. First, if an applicant had a prior annual salary at or exceeding a Level II or Level III stipend, then the applicant would receive the highest stipend level that their prior salary exceeded, irrespective of their years of experience. *Id.* ¶¶ 51, 53. Second, the stipend policy included an exception for engineers. Unlike other professions, "[e]ngineers need not possess a doctorate" and could count years of post-master's degree experience for purposes of the stipend levels. *Id.* ¶ 54.

Dr. Roberts-Gregory requested a Level III stipend, "the highest level of compensation." *Id.* ¶ 73. She does not state how many years of post-doctorate experience she had, but she allegedly told Association staff in a subsequent email that her "most recent full-time salary offer" was "$135K and [her] 2023 wages + compensation" had been "$131,118.07." *Id.* ¶ 89.

3

Association staff responded to Dr. Roberts-Gregory's stipend request and, she alleges, "incorrectly claimed that [she] was required to submit additional documentation to justify a Level III stipend." *Id.* ¶ 74. Dr. Roberts-Gregory "followed [the] instructions and sent additional tax documents," but the Association responded that she still only qualified for a Level I stipend. *Id.* ¶ 75–76.

Dr. Roberts-Gregory then wrote an email explaining why she believed she qualified for a Level III stipend and why she believed the Association's stipend policy was discriminatory. *Id.* ¶¶ 77–80. She explained that she qualified "based on her prior salary," and she offered to provide contact information for people who could "confirm [her] previous salary." *Id.* ¶¶ 78, 80. She also argued "that the Stipend Policy has a discriminatory impact on women and people of color." *Id.* ¶ 80. She wrote, "[a]s a working professional, Black woman caretaker, and interdisciplinary scientist with 10+ years of relevant work experience in various environmental sectors (and with many of the aforementioned identities), I cannot afford to take a $50-100K pay cut, nor have my 10+ years of work experience erased." *Id.* She offered to "share more thoughts and work towards a satisfactory solution so that AAAS is not complicit in worsening the racialized and gendered pay gap, contributing to inequities, and disadvantaging interdisciplinary scientists from underrepresented backgrounds when we are already underrepresented in AAAS finalist numbers." *Id.*

The Association again declined Dr. Roberts-Gregory's request for a Level III stipend. *Id.* ¶ 81. The Association explained that prior salaries must be "based on the documentation outlined in the policy (pay stubs within the last 6 months or a W2 or 1099 from 2022/2023 documenting the salary requested, *not a partial year*)." *Id.* (emphasis added). Dr. Roberts-

4

Gregory and the Association continued to communicate back and forth, and both adhered to their previously stated positions. *See id.* ¶¶ 82–89.

Eventually, Dr. Roberts-Gregory met with Dr. Rashada Alexander, the director of the Fellowship program, and Dr. Mackenzie to discuss the situation. Compl. ¶¶ 87, 92–93, 96.[2] At the meeting, "Dr. Alexander accused Dr. Roberts-Gregory of turning AAAS and its staff into 'adversaries'" and claimed that she "had denigrated AAAS staff members." *Id.* ¶¶ 93, 95. Dr. Roberts-Gregory denies both accusations. *See id.* ¶¶ 94–95. Drs. Alexander and Mackenzie "also threatened to impose new conditions on Dr. Roberts-Gregory's acceptance of the Fellowship, including requiring Dr. Roberts-Gregory to attend communications training." *Id.* ¶ 97.

After the meeting, Dr. Roberts-Gregory reached out to her contacts at the State Department—Mr. Brown and Christine Bishai—about the stipend discussions. *Id.* ¶ 98. She claimed that the Association had "attacked her and attempted to punish and censor her." *Id.* ¶ 100. In response, "Mr. Brown emphasized the importance of Dr. Roberts-Gregory conforming with what AAAS was asking." *Id.* ¶ 99.

Dr. Roberts-Gregory continued to discuss her concerns with the Association. *See id.* ¶¶ 103–04. She wrote that "behavior from AAAS staff, in addition to being inappropriate and unprofessional, amounted to abuse, threats, and bullying of me for daring the raise the question of equity and to challenge the evaluation of my credentials." *Id.* ¶ 103.

This prompted a response from Dr. Alexander, stating that Dr. Roberts-Gregory's "recent engagement via email with STPF staff missed the mark." *Id.* ¶ 107. The Complaint alleges that Dr. Alexander "criticized Dr. Roberts-Gregory for complaining that the stipend policy was

---

[2] The Complaint does not indicate Dr. Mackenzie's full name or title, among others.

racially discriminatory, and discriminatory based on sex," and Dr. Alexander also suggested that Dr. Roberts-Gregory "was not fit to work in the federal government because she raised such concerns." *Id.* ¶ 108. "Dr. Alexander also falsely claimed that Dr. Roberts-Gregory did not follow the stipend policy's submission rules and missed deadlines," even though Dr. Roberts-Gregory maintains she "submitted all relevant information timely and complied with the submission guidelines given to her by AAAS." *Id.* ¶ 110. Finally, Dr. Alexander warned Dr. Roberts-Gregory that "the placement offer that you have accepted is contingent upon participation in the STPF" and that "[t]he prospective host office is currently determining *whether* and how *they* would like to proceed with your placement. If *they* choose not to proceed, you will return to the finalist pool still awaiting matches." *Id.* ¶ 111 (emphases added).

Nevertheless, Dr. Alexander raised Dr. Roberts-Gregory's stipend offer to a Level II stipend. *Id.* ¶ 113. This offer was contingent upon Dr. Roberts-Gregory taking a series of remedial steps. She had to "send a written apology to" certain staff "for the unnecessary personal attacks directed towards them," "complete a suite of LinkedIn Learning courses focused on communicating through disagreement and inclusive communication," copy "the STPF Director and AAAS Chief Programs Officer on all communications with STPF staff going forward," and "have no direct contact with the STPF Senior Grants Director." *Id.* Dr. Roberts-Gregory claims she accepted the offer and the conditions—although she reiterated her view that she qualified for a Level III stipend, denied ever having "criticized, denigrated, or attacked any staff person personally," and explained that "it was unfair for AAAS to place new conditions on her acceptance of the Fellowship after she raised concerns about the stipend." *Id.* ¶¶ 116–18, 123–27. Dr. Roberts-Gregory also made "a loving, yet formal, request for mediation." *Id.* ¶ 114.

6

A few days later, Mr. Brown from the State Department "contacted Dr. Roberts-Gregory to ask how things were progressing with AAAS." *Id.* ¶ 129.  He advised her that he had been "asked by the AAAS team to join a call to discuss her and her Fellowship placement." *Id.*  He also "reassured Dr. Roberts-Gregory that she was the top choice for his office" and noted that "he was confused about why AAAS did not understand 'who you are.'" *Id.*

Later that day, Dr. Alexander informed Dr. Roberts-Gregory that "the fellowship offer you previously received will be revoked, and your application will be withdrawn from the STPF process." *Id.* ¶ 130.  Dr. Alexander explained "that the Fellowship offer was being revoked because of 'the way' Dr. Roberts-Gregory had presented concerns about the stipend level and race and gender discrimination within the Fellowship program." *Id.* ¶ 132.  Dr. Alexander "claimed that the way that Dr. Roberts-Gregory presented concerns to AAAS could 'impact [her] ability to build relationships both within and outside of the STPF program' and that her words had the impact of attacking and harming relationships with staff members." *Id.* ¶ 133. Dr. Roberts-Gregory disputes those claims.  *See id.* ¶¶ 133–34.

Dr. Roberts-Gregory now sues both the Association and the Federal Defendants, and the Federal Defendants move to dismiss the claims against them under Fed. R. Civ. P. 12(b)(6).  *See* Fed. Defs.' Mot. to Dismiss & Mem. in Supp. Thereof ("Defs.' Mot.") at 1, ECF No. 19. Dr. Roberts-Gregory sues the Federal Defendants for retaliation in violation of the Equal Pay Act (Count VIII), race and sex discrimination in violation of Title VII of the Civil Rights Act (Count IX), and retaliation in violation of Title VII of the Civil Rights Act (Count X).  Compl. ¶¶ 202– 26.

### III. LEGAL STANDARD

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That plausibility requirement applies to each element of each claim. *See Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022). "In assessing the sufficiency of the pleadings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor." *Id.* at 395. That said, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### IV. ANALYSIS

The Federal Defendants move to dismiss all three counts that Dr. Roberts-Gregory alleges against them. *See* Compl. ¶¶ 202–26 (Counts VIII–X). First, the Federal Defendants observe, although do not argue, that this Court may lack jurisdiction over Count VIII, Dr. Roberts-Gregory's Equal Pay Act claim. Defs.' Mot. at 11. The Court concludes, however, that it maintains jurisdiction over that count. Second, the Federal Defendants contend that Dr. Roberts-Gregory fails to state a claim of race and sex discrimination under Title VII of the Civil Rights Act of 1964 for Count IX. *Id.* at 15, 20. The Court agrees that Dr. Roberts-Gregory has failed to state a claim for race or sex discrimination based on disparate treatment but finds that she has stated a claim based on disparate impact. Finally, the Federal Defendants urge the Court to dismiss Count X, but the Court finds that Dr. Roberts-Gregory has stated a claim for retaliation under Title VII.

### A.  The Court has jurisdiction over Dr. Roberts-Gregory's Equal Pay Act Claim

The parties agree that the Court has jurisdiction over Dr. Roberts-Gregory's Equal Pay Act claim.  But the Federal Defendants remind the Court that it has an independent obligation to assure itself that it has jurisdiction over each claim.  *See* Defs.' Mot. at 11–12; *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  And, out of respect for their duty of candor to the Court, the Federal Defendants point out that the D.C. Circuit has held that the district courts lack jurisdiction over certain Fair Labor Standards Act ("FLSA") claims, which must instead be brought in the Court of Federal Claims.  *See* Defs.' Mot. at 12; *Waters v. Rumsfeld*, 320 F.3d 265, 272 (D.C. Cir. 2003).

The jurisdictional issue that the Federal Defendants raise derives from the Tucker Act. That statute confers jurisdiction on the United States Court of Federal Claims for any claim exceeding $10,000 "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1); *see also* 28 U.S.C. § 1346(a)(2) (providing concurrent jurisdiction in the district court for claims "not exceeding $10,000").  Here, Dr. Roberts-Gregory is suing the United States (the State Department) under an "Act of Congress" (the Equal Pay Act). § 1491(a)(1); *see* Compl. ¶¶ 202–06.

The Tucker Act's grant of jurisdiction in the Court of Federal Claims acts as a waiver of the federal government's sovereign immunity.  *See United States v. Bormes*, 568 U.S. 6, 10 (2012).  Thus, unless another statute waives the federal government's sovereign immunity for the plaintiff's claim, the Tucker Act's grant of jurisdiction to the Court of Federal Claims is "exclusive."  *Greenhill v. Spellings*, 482 F.3d 569, 572 (D.C. Cir. 2007); *see Van Drasek v.*

9

*Lehman*, 762 F.2d 1065, 1071 n.10 (D.C. Cir. 1985).  And in the context of the FLSA, the D.C. Circuit has held the claims against the federal government for over $10,000 "are within the exclusive jurisdiction of the Court of Claims." *Waters*, 320 F.3d at 270 (quoting *Goble v. Marsh*, 684 F.2d 12, 15 (D.C. Cir. 1982)).[3]

As Dr. Roberts-Gregory points out, however, *Waters* is distinguishable. She argues that her Equal Pay Act claim is not subject to the Tucker Act because it is a retaliation claim, which sounds in tort, and the Tucker Act applies only to claims "not sounding in tort."  28 U.S.C. § 1491(a)(1); *see Megapulse, Inc. v. Lewis*, 672 F.2d 959, 963 n.13 (D.C. Cir. 1982) (explaining that under the Tucker Act the "Court of Claims has exclusive jurisdiction over all *non-tort claims* (including contract claims) for monetary relief in excess of $10,000 against the United States" (emphasis added)); Pl.'s Opp'n to Gov't's Mot. to Dismiss ("Pl.'s Opp'n") at 8, ECF No. 23.

The Federal Circuit faced the same issue in *Jentoft v. United States*, 450 F.3d 1342 (Fed. Cir. 2006).  The court determined that a retaliation claim under the Equal Pay Act sounds in tort and therefore held that the Court of Federal Claims lacked jurisdiction because the Tucker Act did not apply.  *Id.* at 1349–50.  The D.C. Circuit has also intimated, albeit in dicta, that a "district

---

[3] This holding from *Waters* may not be on solid legal ground.  The Supreme Court has explained that the Tucker Act's grant of "jurisdiction is 'exclusive' only to the extent that Congress has not granted any other court authority to hear the claims." *Bowen v. Massachusetts*, 487 U.S. 879, 910 n.48 (1988).  The D.C. Circuit has said much the same: "[J]urisdiction of the Court of Claims for suits claiming more than $10,000 is not exclusive; rather, there is rarely any statute available that waives sovereign immunity for suits in the district court, other than the Tucker Act with its $10,000 limit." *Van Drasek v. Lehman*, 762 F.2d 1065, 1071 n.10 (D.C. Cir. 1985) (quoting *Ghent v. Lynn*, 392 F. Supp. 879, 881 (D. Conn. 1975)); *see also Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citing both *Bowen* and *Van Drasek*).  On this view, district courts enjoy concurrent jurisdiction with the Court of Federal Claims if the plaintiff's claim has an independent source of subject-matter jurisdiction and an independent waiver of federal sovereign immunity.  The FLSA has both.  *See Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 694 (2003) (subject-matter jurisdiction); *Thompson v. Sawyer*, 678 F.2d 257, 280 n.23 (D.C. Cir. 1982) (sovereign-immunity waiver).

court would have had jurisdiction over a retaliation claim" in a case like this. *Greenhill*, 482 F.3d at 572. Following *Jentoft*, the Court agrees that Dr. Roberts-Gregory's retaliation claim does not fall within the Tucker Act.

### B. Dr. Roberts-Gregory states a disparate-impact, but not a disparate-treatment, claim.

As a preliminary matter, Dr. Roberts-Gregory appears to allege two distinct theories of liability within Count IX—disparate treatment and disparate impact. Because the two theories have different elements, some courts have required a plaintiff to plead them separately. *See, e.g.*, *Galena Goins v. United Parcel Serv. Inc.*, No. 21-CV-08722-PJH, 2022 WL 17652798, at *1 (N.D. Cal. Dec. 13, 2022). The two theories also lead to different remedies because a plaintiff who prevails under a disparate-treatment theory may recover damages, but a plaintiff who prevails under a disparate-impact theory cannot. *See* 42 U.S.C. § 1981a(a)(1). Although the Court will not require Plaintiff to replead the counts separately, it will analyze them independently for the purposes of this Motion—as the parties have done in their briefs. *See* Pl.'s Opp'n at 14, 18 ("Dr. Roberts-Gregory has sufficiently pled a *claim* of disparate treatment"; "Dr. Roberts-Gregory has sufficiently pled a *claim* of disparate impact." (emphases added)).

### 1. Dr. Roberts-Gregory fails to state a disparate-treatment claim.

A disparate-treatment claim requires the plaintiff to prove (or, at this stage, allege facts indicating) that the defendant acted with a discriminatory motive. *See Davis v. District of Columbia*, 925 F.3d 1240, 1248 (D.C. Cir. 2019). The two key elements of disparate-treatment claims "are that (i) the plaintiff suffered an adverse employment action (ii) because of the

plaintiff's" protected trait.  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008)

(Kavanaugh, J.).[4]

Here, Dr. Roberts-Gregory does not allege any facts supporting an inference that she

received a Level I stipend offer due to discriminatory disparate treatment.  The Complaint

alleges that she qualified for a Level III stipend because her salary immediately before the

Fellowship paid her $131,118.07—more than the Level III stipend.  Compl. ¶¶ 78, 89.  She

alleges, however, that she was denied a Level III stipend when the Association told her that, per

the Association's "policy," she needed to demonstrate her previous salary with either "pay stubs

within the last 6 months or a W2 or 1099 from 2022/2023 documenting the salary requested, not

a partial year."  *Id.* ¶ 81.  These allegations do not suffice to state a claim.

At least in a case like this one, where the Complaint alleges that the Association provided

a facially neutral explanation for its decision—requiring particular documentation of the prior

salary—Dr. Roberts-Gregory must allege something more to create a plausible inference that the

Federal Defendants acted with a discriminatory motive.  That is because a complaint must plead

facts that are more than "merely consistent with" the defendant participating in unlawful

conduct.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  In *Twombly*, the Supreme

Court confronted allegations that a group of defendants had engaged in "parallel behavior"—i.e.,

similar behavior—to keep out competitors.  *Id.* at 565.  The Court acknowledged that this

"parallel conduct" was "consistent with conspiracy," which would violate antitrust laws, but it

was also "just as much in line with a wide swath of rational and competitive business strategy

---

[4] The Complaint does not tell whether Dr. Roberts-Gregory brings a but-for-causation claim or a mixed-motive claim.  *See Ponce v. Billington*, 679 F.3d 840, 844–45 (D.C. Cir. 2012) (differentiating the two claims).  Her brief simply invokes the "because of" standard, so the Court will do the same.  *See* Pl.'s Opp'n at 15 (quoting *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 158 (D.D.C. 2013)).

unilaterally prompted by common perceptions of the market," which would be lawful. *Id.* at 554. Because the parallel conduct could just as easily be explained by lawful activity, it did not create "a plausible suggestion of conspiracy," and the Court held that the complaint failed to state a claim. *Id.* at 566.

Applying *Twombly*'s logic here, Dr. Roberts-Gregory fails to state a claim because she has not alleged anything to suggest that her stipend offer was motivated by discrimination as opposed to simply following a facially neutral policy. For example, she does not allege that other applicants were given a Level III stipend based on their prior salaries without providing the kind of documentation demanded of her. Nor does she allege that this documentation policy—or even the policy considering prior salary in general—was adopted with a discriminatory motive, as opposed to merely having a discriminatory effect. Dr. Roberts-Gregory therefore fails to allege "a plausible suggestion of" discriminatory motive. *Twombly*, 550 U.S. at 566.[5]

Dr. Roberts-Gregory's counterarguments conflate disparate treatment with disparate impact. The bulk of her argument on this point is that the Court may draw a plausible inference of discriminatory motive because she alleges that she told employees of both the Association and

---

[5] Dr. Roberts-Gregory also does not appear to dispute that the stipend policy actually required her to provide the requested documentation to establish her prior salary, nor does she allege that she provided the documentation required and was nonetheless rejected. Although she vaguely alleges that a prior request for additional information was "incorrect[ ]," Compl. ¶ 74, it is not clear what she means by that allegation. Nor does she even reference this allegation in her opposition. To be sure, the D.C. Circuit has recently indicated that a party need not "reference every single allegation supporting [an argument] or else risk forfeiture of an unmentioned allegation." *Naz v. Wright*, No. 23-5237, 2026 WL 1657113, at *5 (D.C. Cir. June 9, 2026). In this case, however, Dr. Roberts-Gregory not only fails to reference the allegation but also fails to make any argument in her opposition that she faced disparate treatment because *the documentation policy* was applied to her in a discriminatory fashion. *Cf. id.* at *5 (noting, as a reason against forfeiture, that *amicus* "made a fulsome argument" on the point even if it failed to reference the allegation). The Court, therefore, will not consider any such argument. *See U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 708 (D.C. Cir. 2016).

the State Department that their policies disproportionately impacted women and minorities. *See* Pl.'s Opp'n at 17. For example, she alleges she told the Association that "the method [it] uses to calculate years of experience disadvantages fields disproportionately occupied by and methodologies disproportionately used by Black women." Compl. ¶ 83. Similarly, she alleges that "[t]he Stipend policy has a disparate impact on women and Black applicants because it bases salary on prior wage rates, which disproportionately harms women and people [of] color because it ensures that systemic pay discrimination is a feature of setting salary rates." *Id.* ¶ 214.

None of these allegations suggests that Dr. Roberts-Gregory was *treated* differently under the policy—such as because the policy was applied to her in a discriminatory fashion or because the policy was pretextual. Instead, the allegations Dr. Roberts-Gregory invokes indicate that the policy had a disparate *effect* on her and those who share her protected traits. That is not a disparate-treatment claim. *See Equal Emp. Opportunity Comm'n v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016) ("An allegation of adverse consequences, without more, is not sufficient to state a claim for disparate treatment."). As explained above, the distinction between disparate treatment and disparate impact matters because they are distinct legal theories with different elements and different remedies. *See 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 682 (D.C. Cir. 2006) ("In contrast to disparate impact plaintiffs, plaintiffs alleging disparate treatment must establish not that a facially neutral policy disproportionately affected a protected class, but that the defendant intentionally discriminated against them on the basis of race or ethnicity."); *see also Davis v. District of Columbia*, 949 F. Supp. 2d 1, 7–9 (D.D.C. 2013) (discussing theories of disparate impact and disparate treatment).

The closest Dr. Roberts-Gregory comes to alleging disparate treatment is her allegation about similarly situated colleagues. She alleges that her stipend offer was "unequal to similarly

14

situated male colleagues, despite her Fellowship position requiring equal skill, effort, and responsibility to be performed under similar working conditions." Compl. ¶ 212; *see* Pl.'s Opp'n at 15. The Court acknowledges that alleging that similarly situated individuals without the plaintiff's protected trait were treated differently can raise a plausible inference of discrimination. *See Keith v. U.S. Gov't Accountability Off.*, No. CV 21-2010 (RC), 2022 WL 3715776, at *3 (D.D.C. Aug. 29, 2022). But this one does not.

Dr. Roberts-Gregory's comparator allegation resembles those rejected by the D.C. Circuit in *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523 (D.C. Cir. 2025). There, the plaintiff alleged racial discrimination because "he was not assigned to a 'particular workstream' for over two months after beginning work at [a law] firm." *Id.* at 532. He alleged that, by contrast, "three Caucasian attorneys who began at [the law firm] either before or after him were immediately assigned to workstreams." *Id.* He further alleged that every other attorney of a different race that had been hired through the same program had been "immediately assigned to workstreams." *Id.* The court held that these allegations did not state a claim because the allegations contained "no information about the other attorneys' experience or qualifications relative to" the plaintiff. *Id.* The allegations, therefore, did not show that the "comparators worked in the same position in a meaningful sense." *Id.* Moreover, the complaint did not adequately describe what it meant by a "workstream" or allege that the comparators shared the same supervisor as the plaintiff. *Id.* at 532–33.

As in *Joyner*, Dr. Roberts-Gregory fails to allege that her comparators were "in the same position in a meaningful sense." *Id.* at 532. She does not allege that these "male colleagues" participated in the Fellowship program. Compl. ¶ 212. Admittedly, Dr. Roberts-Gregory argues in her brief that she was offered "a lower salary than similarly situated *applicants* based on her

15

race and gender," Pl.'s Opp'n at 15 (emphasis added), but she does not allege that in her complaint (and it might be too conclusory if she had). And, as discussed above, the other allegations cited in support of this statement refer to a disparate-impact theory, not a disparate-treatment theory, or are otherwise conclusory. *See* Compl. ¶¶ 3, 80, 210–11, 213, 215–17.

Moreover, and like the deficient allegation in *Joyner*, Dr. Roberts-Gregory alleges "no information about the [colleagues'] experience or qualifications relative to" her. *Joyner*, 140 F.4th at 532. She does not allege whether these colleagues qualified for their Level III stipend because they had enough post-doctoral experience (unlike her) or because of a prior salary. And if it was because of a prior salary, she does not allege that they submitted the same kind of documentation that she did and which the Association deemed insufficient in her case. Dr. Roberts-Gregory's allegation is therefore too conclusory to state a claim.

In a final attempt to salvage her disparate-treatment claim, Dr. Roberts-Gregory insists that her claim can survive a motion to dismiss without alleging facts that lead to a plausible inference of discrimination. Relying on a case out of the Seventh Circuit, she argues that "while she does need to show a causal link between [her protected trait and the adverse employment act], she may do so by relying on conclusory allegations that they are linked by racial animus." Pl.'s Opp'n at 18 (quoting *Bland v. Edward D. Jones & Co., L.P.*, No. 18-CV-03673, 2020 WL 7027595, at *14 (N.D. Ill. Nov. 30, 2020)).

The D.C. Circuit has foreclosed this argument. In *Ho v. Garland*, 106 F.4th 47 (D.C. Cir. 2024), the D.C. Circuit explained that prior cases which allowed such conclusory allegations had been overruled by the Supreme Court's decisions in *Twombly* and *Iqbal*. *Ho*, 106 F.4th at 51 n.2. And in *Joyner*, the D.C. Circuit expressly rejected the approach adopted by the Seventh Circuit, upon which Dr. Roberts-Gregory relies. *See* 140 F.4th at 530 n.2.

## 2.  Dr. Roberts-Gregory states a disparate-impact claim.

Contrasted with a disparate-treatment claim, which requires evidence of a "discriminatory motive, disparate impact supports liability in the absence of proof of invidious intent, based on evidence that the challenged practices have a disproportionately adverse effect on the plaintiffs that cannot be justified as necessary to an employer's business." *Davis v. District of Columbia*, 925 F.3d 1240, 1248–49 (D.C. Cir. 2019). "[T]o state a disparate impact claim, a plaintiff must identify specific employment practices that are responsible for statistical [protected trait] disparities." *Davis v. District of Columbia*, No. CV 10-1564 (RC), 2024 WL 756640, at *9 (D.D.C. Feb. 23, 2024), *appeals filed*, Nos. 24-7038 & 24-7939 (D.C. Cir. Mar. 26, 2024).

Although not entirely clear, Dr. Roberts-Gregory appears to argue that the Federal Defendants' stipend policy creates a disparate impact in two ways. *See* Pl.'s Opp'n at 20–21. She alleges that the policy of raising an applicant's pay based on their prior salary creates a disparate impact against minority and female applicants because it bakes in pay disparities from those previous positions. Compl. ¶¶ 213–14. She further alleges that the stipend policy creates an exception for engineers, who can count pre-doctorate experience for purposes of calculating the appropriate stipend while other professions can only count post-doctorate experience, which creates a disparate impact because engineers are disproportionally men. *Id.* ¶¶ 54–55.

The Federal Defendants raise two challenges to the disparate-impact claim, but neither persuades the Court.[6] First, the Federal Defendants maintain that they are not responsible for the

---

[6] The Federal Defendants do not challenge the substance of Dr. Roberts-Gregory theories. That is, they do not question whether, even if proven, Dr. Roberts-Gregory's theory of prior-salary discrimination can establish unlawful discrimination—an issue which has apparently split the Circuit courts. *See Rizo v. Yovino*, 950 F.3d 1217, 1234–35 (2020) (en banc) (McKeown, J., concurring in the judgment) (discussing Circuit split). *Compare id.* at 1219 (majority opinion)

stipend policy and therefore are not the proper defendants. *See* Defs.' Mot. at 26 (arguing the stipend policy "is not even the Federal Defendants' doing or responsibility"); *see also id.* at 16. The Federal Defendants emphasize "that the Association 'is responsible for determining the stipend level for Fellows pursuant to [its] policies'" and that the "[f]inal determination of the stipend level [is] made by AAAS." *See id.* (quoting Compl. ¶ 47). The Complaint also alleges, however, that the Association "*and the Department of State* implemented" the stipend policy "in which employees' salary could be set exclusively by an applicants' prior salary history." Compl. ¶ 3 (emphasis added). Moreover, according to the Complaint, the Association determines Fellowship applicants' salaries "based on agreements jointly developed between the agencies and AAAS." *Id.* ¶ 48; *see also id.* ¶ 45 ("Both AAAS and the Department of State also jointly control the pay and benefits of Fellows."). Taking these allegations as true, as the Court must at this stage, there is a plausible basis to infer that the Federal Defendants share responsibility for the allegedly discriminatory portions of the stipend policy.

Second, the Federal Defendants fault Dr. Roberts-Gregory for not alleging sufficient statistical information about the purported disparity among Fellowship applicants. Defs.' Mot. at 21–26. The Federal Defendants argue that Dr. Roberts-Gregory fails to allege "how many fellowship positions exist, detail[ ] the race or sex of the persons occupying those positions, or

---

(holding that the Equal Pay Act does not permit employers to rely on prior salaries to explain pay disparities), *with Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019) (holding that prior salaries constitute a nondiscriminatory factor other than sex for purposes of the Equal Pay Act and Title VII). Nor do they question whether engineers are similarly situated to scientists like Dr. Roberts-Gregory. Federal Defendants also do not ask whether Dr. Roberts-Gregory was personally injured by the prior-salary policy she challenges given that she alleges she in fact had a prior salary sufficient to qualify for a Level III stipend. *See* Compl. ¶ 89; *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 181 (D.D.C. 2017) (Jackson, J.) ("Furthermore, and notably, a plaintiff must demonstrate that she was personally injured as a result of an employment policy with a disparate impact in order to be able to challenge the policy under Title VII.").

provide[ ] factual allegations linking those persons with the practices that [she] challenges." *Id.* at 23; *see also id.* at 24–25 ("Plaintiff provides no information about how many engineers were in the fellowship program, what their race and gender were, and at what stipend level they began.").

The Court disagrees. Dr. Roberts-Gregory starts by alleging baseline disparities in the market, outside the confines of the Fellowship program. She alleges that minorities and women in STEM fields face pay disparities, and she alleges that engineering is a disproportionately male field. Compl. ¶¶ 55, 214–15. The Federal Defendants do not argue that Dr. Roberts-Gregory needed to allege statistical support for these baseline disparities, so the Court will treat them as true for purposes of this motion. *See* Defs.' Mot. at 23 (arguing only that statistics about disparities *in the program* were needed). Next, Dr. Roberts-Gregory alleges that by advantaging applicants with an engineering background or with high previous salaries, the stipend policy imports these preexisting disparities into the stipend offers. *See* Compl. ¶¶ 84–85.

In the Court's view, drawing all inferences in Dr. Roberts-Gregory's favor, this suffices to allege a plausible claim of a disparity within the Fellowship program—albeit barely so. If there are pay disparities in the STEM market, then it is plausible that using an applicants' prior salary in the STEM market to inform their stipend will result in stipend offers reflecting those preexisting pay disparities. And giving preferential salary treatment to only engineers, if it is a disproportionately male field, could plausibly result in a disparate impact in favor of men.

The Court acknowledges that Dr. Roberts-Gregory's allegation that a disparity exists within the Fellowship program is weak. She provides no detail about the purported disparity except for the somewhat conclusory allegation that one exists. *See* Compl. ¶ 85. Nevertheless, the Complaint's facially plausible mechanism for how the stipend policy carries over pay

disparities from the broader market to the Fellowship program distinguishes this case from others where courts have demanded more factual allegations supporting a claim that a disparity exists. *Cf. Townsend v. United States*, 236 F. Supp. 3d 280, 308–09 (D.D.C. 2017) (dismissing disparate-impact claim because the plaintiff "offer[ed] no statistical or other evidence to support his claim that the policy had a disparate impact on older employees").

The Federal Defendants' insistence on statistical allegations of a disparity in the Fellowship program at this stage is unpersuasive because it is premature. *See* Defs.' Mot. at 22. Although "at some point" Dr. Roberts-Gregory will have to present evidence that a substantial disparity exists, she "need not" do so now. *Jianqing Wu v. Special Couns.*, 2015 WL 10761295, at *2 (D.C. Cir. Dec. 22, 2015) (per curiam) (unpublished); *see also Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1085–86 (D.C. Cir. 2011) (explaining, in the context of a preliminary injunction, that a "plaintiff must generally 'demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group'" (quoting *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006)).

Relying on *Jianqing Wu*, the Federal Defendants argue that Dr. Roberts-Gregory must at least show how she will later be able to provide statistical evidence of a disparity. Defs.' Mot. at 22. But that is not what was required in *Jianqing Wu*. There, the D.C. Circuit affirmed the dismissal of a disparate-impact claim because the plaintiff's brief argued that "valid statistical proof [would be] impossible" in his case. *Jianqing Wu*, 2015 WL 10761295, at *2. The court therefore held that the plaintiff had "effectively pled himself out of court by making clear that he cannot prove the facts necessary to sustain his cause of action." *Id.* (cleaned up). Dr. Roberts-Gregory, by contrast, has not indicated that she will have any difficulty providing statistical

evidence further down the line. And the Federal Defendants have offered no reason to suspect doing so will prove infeasible.

For similar reasons, the Court finds the Federal Defendants' reliance on *Brown v. Mayorkas*, No. CV 20-3107 (TJK), 2023 WL 3303862 (D.D.C. May 8, 2023), unavailing. The court in *Brown* stated that a "plaintiff must still indicate in the complaint that she will later be able to provide some sort of statistical evidence to survive a motion to dismiss." *Id.* at \*11. That may be necessary in some cases, but it is not necessary here. It is intuitive from the nature of the allegations in the Complaint that discovery may yield statistical evidence regarding the alleged disparity—or at least data from which experts may derive statistical evidence. For example, discovery may plausibly reveal the demographics of the applicants who do or do not benefit from the prior-salary exception. The Court does not believe Fed. R. Civ. P. 8(a) requires Dr. Roberts-Gregory to outline this process—or any other proposed statistical methodology based on the data she may acquire in discovery—to state a claim in a case like this.

At any rate, the failure to indicate an ability to provide statistical evidence in the future was not a basis for the Court's decision in *Brown*. The court dismissed the disparate-impact claim because the plaintiff did "not allege, statistically *or otherwise*, any race- or sex-based disparities among the" "specific positions that are the subject of the allegedly discriminatory practice she identifies." *Id.* at \*12 (emphasis added). And the court concluded that it did not follow from allegations of a racial disparity among lower-level employees that the "challenged promotion policy *related to managerial and supervisory positions* caused that disparity." *Id.* In other words, the allegedly discriminatory policy did not apply to the employees with the alleged disparity. In this case, however, Dr. Roberts-Gregory alleges tat a disparate impact is felt by the relevant group—applicants to the Fellowship program. Compl. ¶ 214. Moreover, unlike in

*Brown*, there is a plausible causal link between the stipend policy for applicants and the ultimate stipends of those applicants.[7]

### C.  Dr. Roberts-Gregory states a retaliation claim.

To state a claim for unlawful retaliation, Dr. Roberts-Gregory must allege that (1) she "engaged in statutorily protected activity," (2) the Federal Defendants "took a materially adverse action against" her, and (3) her "protected activity was a but-for cause of that adverse action." *Ho v. Garland*, 106 F.4th 47, 51 (D.C. Cir. 2024) (cleaned up).  Although far from clear, Dr. Roberts-Gregory appears to allege that the Federal Defendants retaliated against her by rescinding her Fellowship offer after she complained about purportedly discriminatory policies. Compl. ¶¶ 223–24.[8]

The Federal Defendants challenge only the second element. They argue that the Association, not the Federal Defendants, rescinded Dr. Roberts-Gregory's offer, and therefore the Federal Defendants cannot be liable.  Defs.' Mot. at 28.

---

[7] The Federal Defendants also point to *Smith v. City of Jackson*, 544 U.S. 228 (2005), a summary-judgment case; but that decision only bolsters Dr. Roberts-Gregory's claim. In *Smith*, the Supreme Court stated that "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Id.* at 241.  Instead, a plaintiff is "responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Id.* (quoting *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656 (1989), *superseded by statute*, 42 U.S.C. § 2000e-2, *as recognized in Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015)).  Dr. Roberts-Gregory has done so.  She does not allege that the stipend policy, as a whole, creates a disparate impact.  Instead, she has "isolated[ed] and identif[ied]" two "*specific* employment practices" within the stipend policy—the exceptions for prior salaries and engineers—that she alleges create a disparate impact. *Id.* (quoting *Wards Cove*, 490 U.S. at 656).

[8] The Federal Defendants understandably briefed another retaliation theory as well, given the vagueness of the Complaint.  *See* Defs.' Mot. at 27; Compl. ¶ 224 (failing to specify the retaliatory act).  Because Dr. Roberts-Gregory does not defend any other retaliation theories in her opposition, the Court deems her to have conceded that any other theory does not state a claim.  *See Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 208 (D.D.C. 2016).

22

The Court disagrees. According to the Complaint, both the Association and the State Department could independently or jointly cause Dr. Roberts-Gregory to lose her Fellowship placement offer—although only the Association could exclude her from the Fellowship program itself. Compl. ¶ 44. A few days before the revocation decision, Dr. Roberts-Greogry alleges she was told the State Department was reconsidering her offer. *Id.* ¶ 111. And on the day before the revocation, Dr. Roberts-Gregory alleges that one of her State Department contacts had been "asked by the [Association] to join a call to discuss her and her Fellowship placement," although he assured her that "his office really wanted her to come work for them." *Id.* ¶ 129. The next day, Dr. Roberts-Gregory alleges that Dr. Alexander told her that her "fellowship offer" was "revoked" and that her "application w[ould] be withdrawn from the STPF process." *Id.* ¶ 130. Drawing all inferences in favor of Dr. Roberts-Gregory, these allegations permit a plausible inference that the Federal Defendants and the Association jointly decided to revoke Dr. Roberts-Gregory's offer, even if only the Association could remove her from the Fellowship process entirely.

## V. CONCLUSION

For the foregoing reasons, the Federal Defendants' motion to dismiss is granted in part and denied in part. The Court grants the motion to dismiss for the disparate-treatment claim in Count IX but denies it with respect to Count IX's disparate-impact claim. The Court also denies the motion to dismiss regarding Counts VIII and X. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: June 16, 2026                                    RUDOLPH CONTRERAS
                                                        United States District Judge

23